# No. 17-1219

_____

### UNITED STATES COURT OF APPEAL
### SECOND CIRCUIT

_____

JEFFREY SYDNEY, on behalf of themselves and others similarly situated, STEPHEN CAPOUSIS, on behalf of themselves and others similarly situated,

*Plaintiffs - Appellants*,

-v-

TIME WARNER ENTERTAINMENT - ADVANCE/NEWHOUSE PARTNERSHIP,

*Defendant - Appellee*,

TIME WARNER CABLE, INC.,

*Defendant.*

_____

*On Appeal from an Order of the United States District Court for the Northern District of New York*

_____

### APPELLANTS' BRIEF AND SPECIAL APPENDIX

_____

Matthew J. Blit
LEVINE & BLIT, PLLC
350 5th Avenue, Suite 4020
New York, NY 10118
(212) 967-3000
*Attorney for Appellants'*

August 7, 2017

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………….......…………… v

PRELIMINARY STATEMENT……………………………….........… 1

JURISDICTIONAL STATEMENT………………………..…....... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW……......… 2

STATEMENT OF THE CASE……………….......…………………... 3

I.    Nature of the Case……………………………….......………... 3

II.    The Course of the Proceedings and Disposition Below……............ 3

STATEMENT OF FACTS…………………………….......…………… 4

I.    The Parties……………………………………..…………… 4

II.    Appellants' Primary Duty Was Installing and Troubleshooting TWEAN's Products…………………………………………… 5

      A.    Appellants' Performance of Non-Exempt Duties Were More Important than Their Exempt Duties…………..……….......... 5

            1.    The Installation Was Appellants' Most Important Duty………………………………………………… 6

            2.    Maintaining a Positive Relationship with the Property Managers Was More Important than Making Sales…..... 7

            3.    TWEAN Had Other Salesmen Soliciting on Appellants' Territory…………………..………… 8

i

4.     Appellants Were Extensively Trained on the Performance of Installations and Needed to Know How to Install TWEAN Products as a TSR……...……. 8

B.     Appellants Spent the Vast Majority of Their Time Performing Non-Exempt Duties……..………………….9

1.     Most of Appellants' Time Was Spent Preparing for, Traveling to, and Performing Installations……………. 9

2.     Appellants Spent Very Little Time Taking Work Orders from Customers…………………….....…….. 11

C.     Appellants Were Subject to Daily Supervision and Control... 11

II.     Appellants Were Not Outside Salesmen…………….…………. 12

A.     Work Orders Were Not Obtained at Customer's Residence……………………………………….......…… 12

III.     Appellants' Salary Was Minimal and They Were Denied Overtime…………………………………….....................… 12

SUMMARY OF THE ARGUMENT…………….........……………… 13

I.     The District Court Erred in Applying the Summary Judgment Standard to the Material Facts Set Forth by the Parties……..…….. 13

II.     The District Court Erred in Holding that There Was No Genuine Issue of Material Fact Concerning Whether Appellants Were Exempt From Overtime as a Matter of Law………….……………. 14

ARGUMENT…………………………...….........................…….. 15

I.     The District Court Erred in Its Application of the Summary Judgment Standard……………………......................………….. 15

A.     Standard of Review.................................................... 15

B.     The District Court Failed to Consider Undisputed Material Facts Concerning the Applicable Exemption.................... 17

C.     The District Court Failed to Resolve All Ambiguities in a Light Most Favorable to Appellants............................. 18

II.     The District Court Erred by Holding that No Genuine Issue of Material Fact Exists as to Whether Appellants Were Exempt from Overtime as Outside Sales Employees................................ 18

A.     Standard of Review................................................. 18

B.     The Outside Sales Employee Exemption........................ 19

C.     A Genuine Issue of Material Fact Exists as to the Primary Duty of Appellants' TSR Position................................ 19

     1.     Appellants' Installation and Troubleshooting Duties Were More Important to TWEAN than Appellants' Sales Duties.................................................. 21

     2.     Appellants Spent Most of Their Time Preparing to Install, Traveling to Installation Locations, Installing, and Troubleshooting........................................ 22

     3.     Appellants Were Subject to Daily Supervision and Control by TWEAN's Supervisors and Managers...... 23

     4.     Appellants Received a Low Salary and Displaced Service Technicians Who Were Paid an Hourly Wage and Were Eligible for Overtime Pay............... 24

iii

5.     Appellants' Solicitation Efforts Were Minimal……….. 25

6.     The Character of Appellants' Job as a Whole Was that of Laborers, Not Salesmen…………………..... 25

D.    Alternatively, a Genuine Issue of Material Fact Exists as to Whether Appellants Customarily and Regularly Made Sales away from TWEAN's Place of Business………………..... 26

CONCLUSION……………………......................…………………… 28

# **TABLE OF AUTHORITIES**

Cases

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)……………….....................................…………….. 16

*Bryant v. Maffucci,*
    923 F.2d 979 (2d Cir.1991)…………...................................………… 16

*Gallo v. Prudential Residential Servs., LP,*
    22 F.3d 1219 (2d Cir. 1994)…..............……………………… 15, 19

*Lewis v. Mollette,*
    752 F. Supp. 2d 233 (N.D.N.Y. 2010)………..................…………….. 16

*Mullins v. City of New York,*
    653 F.3d 104 (2d Cir. 2011)………………...........................………… 19

*N.Y. Elec. & Gas Corp. v. Sys. Council U-7 of Elec. Workers IBEW,*
    328 F. Supp. 2d 313 (N.D.N.Y. 2004)……………..……………… 16


Statutes and Regulations

28 U.S.C. § 1291…………………………………….....................………. 2

28 U.S.C. § 1331………………………………….......................………… 1

28 U.S.C. § 1367………………………………………...........……………. 1

29 U.S.C. § 207…………………………………………............................…. 3

29 C.F.R. § 541.500(a)…………………………………………….....….... 19

29 C.F.R. § 541.502……………………………………….…………….. 27, 28

v

29 C.F.R. § 541.700(a)………….……….….….…….….…….……. 20

29 C.F.R. § 541.700(b)…………….……….…….……………...…. 20

12 N.Y.C.R.R. 142-2.2……………….....…………….…....…….… 3, 20

## PRELIMINARY STATEMENT

Plaintiffs-Appellants Jeffrey Sydney ("Sydney") and Steven Capousis ("Capousis") (collectively referred to as "Appellants") were employed by defendant-appellee Time Warner Entertainment-Advance/Newhouse Partnership ("TWEAN") as Territory Sales Representatives ("TSRs"). Appellants worked between fifty (50) and seventy (70) hours per week without receiving overtime wages for hours worked in excess of forty in each work week. Instead, Appellants received a base salary of $300.00 per week and could earn commissions. Appellants' primary duty was to install cable, internet, and telephone equipment for customers of TWEAN. Pertinent to the instant appeal, the District Court granted summary judgment to TWEAN on its affirmative defense that Appellants were exempt from overtime pursuant to the outside sales employee exemption under both the Fair Labor Standards Act of 1938 ("FLSA") and the New York Labor Law ("NYLL"). For reasons stated below, Appellants respectfully request that this Court reverse the District Court's holding and remand this action for further proceedings.

## JURISDICTIONAL STATEMENT

The court below had subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367. This

Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. A final judgment was entered in the court below on March 28, 2017. (A000013).[1] Appellants filed a timely Notice of Appeal on April 25, 2017. (A000013). This appeal is from a final judgment that disposes of all Appellants' claims against all defendants.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1) Whether the District Court misapplied the summary judgment standard of review by failing to consider undisputed and disputed material facts relevant to determining Appellants' primary duty, and failing to resolve all ambiguities and draw all reasonable inferences in a light most favorable to the non-moving party.

2) Whether the District Court erred by holding that there was no genuine issue of material fact that Appellants were exempt from overtime as outside sales employees pursuant to the FLSA and NYLL, as a matter of law.

---

[1] The Appendix will be cited to as "A_____."

## STATEMENT OF THE CASE

### I.      Nature of the Case

Pertinent to the instant appeal, Appellants commenced the instant civil action, pursuant to 29 U.S.C. § 207 and the NYLL and its regulations (12 N.Y.C.R.R. 142-2.2, claiming unpaid overtime wages. (A000070-A000080).

### II.     The Course of the Proceedings and Disposition Below

Appellants commenced the instant civil action on March 3, 2013. (A000003). After discovery concluded concerning the individual merits of Appellants' causes of action, TWEAN moved for summary judgment on all of Appellants' causes of action. (A000011). Appellants opposed the motion for summary judgment. (A000011-A000012). After the motion was fully briefed, the Honorable Frederick J. Scullin, Jr. issued a Memorandum-Decision and Order on March 28, 2017 granting summary judgment in favor of TWEAN on all of Appellants' causes of action. (Annexed hereto as the Special Appendix is a true and accurate copy of Judge Scullin's March 28, 2017 Memorandum-Decision and Order). In doing so, the District Court

found that Appellants' primary duty was to obtain sales. (SA000011).[2] The instant appeal followed.

## STATEMENT OF FACTS

### I.    The Parties

Appellants were employees of TWEAN who last held the position of TSR in their capacity with TWEAN. (A000893-A000894, Nos. 18-19). TWEAN is a subsidiary of Time Warner Cable Inc. (A000934, No. 203). TWEAN's principal residential competition for its business was incumbent local telephone companies. (A000934, No. 202). Sydney began working as a TSR for TWEAN on December 3, 2010. (A000893, No. 18). Sydney's employment with TWEAN ended on August 29, 2012. (A000923). Capousis began working as a TSR for TWEAN on December 20, 2010. (A000894, No. 19). Capousis's employment with TWEAN ended on April 9, 2013. (A000925, No. 158).

As a TSR, Sydney worked between 50 and 70 hours per week on average. (A000904, No. 61). As a TSR, Capousis worked between 55 and

---

[2] The Special Appendix will be cited to as "SA_____."

70 hours per week on average. (A000905, No. 64). Appellants were paid a base salary of $300.00 per week. (A000912, No. 96). As TSRs, Appellants were not paid overtime wages for their hours worked in excess of forty in a work week. (A000934, No. 204). TWEAN knew that Appellants were working overtime hours for which they were not being compensated with overtime wages. (A000934, No. 205).

## II.    Appellants' Primary Duty Was Installing and Troubleshooting TWEAN's Products

### A.    Appellants' Performance of Non-Exempt Duties Were More Important than Their Exempt Duties

Appellants' duties as TSRs were to: take work orders from potential customers of TWEAN who called in; perform the installation; troubleshoot technical or mechanical issues for existing customers; and maintain a positive relationship with leasing agents and management of the apartment complexes they were assigned. (A000894 & A000930, Nos. 21 & 184). On a typical day, Appellants would arrive at work and perform the following work: check emails and voicemails, tend to paperwork and work orders, attend meetings and/or check in with their supervisor, go to the warehouse to collect equipment necessary for the day's installations, travel to installation locations, perform installations, and check in with leasing agents or management of their assigned apartment complexes to see if any problems

5

arose. (A000930, No. 184). The TSR position was much more labor intensive than the job of a Direct Sales Representative ("DSR"), because the position of TSR required TWEAN employees to use and be trained on the use of tools and equipment. (A000928 & A000931, Nos. 172-174 & 187-188). Appellants did not directly contact potential customers of TWEAN to obtain work orders; instead, potential customers of TWEAN would contact Appellants to place a work order. (A000928, Nos. 169-170). Appellants were not required to make door to door sales and did not do so. (A000928, Nos. 171). Appellants did not promote ancillary growth of TWEAN products nor did they have any control or input on product prices or promotions. (A000932, No. 190).

### 1. The Installation Was Appellants' Most Important Duty

TWEAN did not have an enforceable service agreement with the customer until the installation occurred. (A000934, No. 208). Also, Appellants would not receive units credited toward their monthly quota until the installation was completed. (A000930, No. 183). If another TSR or technician performed the installation in Appellants' territory, Appellants would not receive units credited toward their monthly quota. (A000930, No. 183). Even when customers requested self-installation kits, TSRs often

6

performed the installation at the customer's request. (A000930, No. 182). The ability to safely and effectively install TWEAN products was vital to becoming a TSR. (A000928 & A000935, Nos. 172-173 & 211-212). If an employee of TWEAN could not learn how to safely and properly install TWEAN products, that employee could not be a TSR. (A000935, No. 215).

### 2. Maintaining a Positive Relationship with the Property Managers Was More Important than Making Sales

Secondary to installation was maintaining a positive relationship with the leasing agents and property managers of the apartment complexes to which Appellants were assigned. (A000929, Nos. 175-177). Appellants were the point of contact for all customers, leasing agents, and property managers of the apartment complexes they were assigned and they would contact Appellants if there were technical difficulties or mechanical issues to be addressed. (A000929-A000930, Nos. 179-180). However, Appellants dealt almost exclusively with the leasing agents and property management of the apartment complexes they were assigned. (A000929, No. 176). One significant way that Appellants maintained a positive relationship with property managers was by troubleshooting tenants' issues with their TWEAN services. (A000929, No. 179). Appellants did not receive any extra compensation for troubleshooting or making repairs. (A000929, No.

179). Another significant way Appellants maintained a positive relationship with property managers was to obey the apartment complexes' rules on non-solicitation. (A000929, No. 178). TSRs were expected to fix technical and mechanical problems with the junction box at the apartment complexes assigned to them. (A000930, No. 181). Without a positive relationship with the leasing agents or property managers, Appellants were less likely to obtain work orders from their assigned apartment complexes. (A000898 & A000930, Nos. 36 & 177).

### 3. TWEAN Had Other Salesmen Soliciting on Appellants' Territory

DSRs were door-to-door salesmen for TWEAN who solicited in the same apartment complexes that were assigned to Appellants. (A000933, No. 201). As such, it is reasonable to infer that making sales was not Appellants' most important duty because TWEAN had other employees responsible for making sales in the same apartment complexes assigned to Appellants.

### 4. Appellants Were Extensively Trained on the Performance of Installations and Needed to Know How to Install TWEAN Products as a TSR

Appellants received a week of safety, equipment, and installation training as part of becoming a TSR. (A000928, No. 172). Appellants received training on the proper use of more than twenty different tools and how to safely install TWEAN products. (A000928, No. 172). Being able to safely and effectively install TWEAN products was vital to becoming a TSR. (A000935, No. 211). The individual who trained Capousis expressed concern that he could not be a TSR because he had difficulty with the installation training. (A000935, No. 212). Sydney also spent several days shadowing TSRs in other territories. (A000928, No. 173). Appellants were trained by a TWEAN technical trainer. (A000928, No. 172).

**B.     Appellants Spent the Vast Majority of Their Time Performing Non-Exempt Duties**

**1.     Most of Appellants' Time Was Spent Preparing for, Traveling to, and Performing Installations**

The actual installation of TWEAN products itself usually took between 30 minutes and an hour to complete, but, many times, it took much longer if technical difficulties emerged. (A000930-A000931, Nos. 185-186). In order to perform an installation, Appellants would gather the necessary equipment from the warehouse, drive to the potential customer's residence, contact the potential customer, locate the junction box, adjust the filters in the junction box according to the services requested, connect the

9

line, connect all the televisions, modems, and telephones, ensure that the services were working, and resolve any routine wiring issues. (A000930-A000931, Nos. 184, 187). Appellants typically performed between 5 and 10 installations per day. (A000934, No. 209).

TWEAN's offices where Appellants worked were located at 6005 Fair Lakes Boulevard, East Syracuse, New York. (A000933, No. 196). TWEAN maintained a warehouse nearby that stored telephone, internet, and cable equipment and other items needed for installations, where Appellants would go before traveling to installation locations. (A000933, No. 197). Appellants were assigned to various apartment complexes throughout Onondaga County that required a significant amount of travel time to reach. (A000933, No. 198). Sydney performed installations throughout Onondaga County, but primarily in the City of Syracuse, Liverpool, and Baldwinsville. (A000935, No. 213). Capousis performed installations throughout Onondaga County and Cortland County, but frequently made trips as far south as Tully, north as Brewerton, and as far east as Manlius and Bridgeport. (A000935, No. 214).

10

### 2. Appellants Spent Very Little Time Taking Work Orders from Customers

Appellants did not directly contact potential customers of TWEAN to obtain work orders; instead, potential customers of TWEAN would contact Appellants by telephone to place a work order. (A000928, Nos. 169-170. Appellants did not obtain work orders by going door to door to solicit new customers and were not required to make door to door sales. (A000928 & A000934, Nos. 171, 207). It took only about 5 to 10 minutes for Appellants to obtain the information needed for the work order. (A000935, No. 210).

### C. Appellants Were Subject to Daily Supervision and Control

As TSRs, Appellants were assigned to various supervisors or managers at different times. (A000933, No. 199). Appellants' supervisors or managers were Stephen Holzhauer, Hang Zhu, William Edwards, and/or Matt LeClair at one time or another. (A000933, No. 199). Appellants were required by their supervisors and mangers to work Monday through Saturday. (A000932, No. 193). Appellants' supervisors and managers required Appellants to go to TWEAN's offices each work day, except some Saturdays, and were required to attend weekly meetings with their supervisors. (A000932, No. 194). Appellants were required to report daily to their supervisors, and keep their supervisors apprised of their location and

the work Appellants were performing. (A000932, No. 191). If Appellants missed a scheduled installation, their supervisors would contact them and seek an explanation as to why the installation was not performed. (A000933, No. 192). TSRs had no authority to offer prices, promotions, or packages other than what was authorized by TWEAN. (A000933, No. 190).

## II.    Appellants Were Not Outside Salesmen

### A.    Work Orders Were Not Obtained at Customer's Residence

Appellants did not directly solicit potential customers for TWEAN. (A000928, No. 169). Instead, potential customers of TWEAN would call Appellants to place a work order. (A000928, No. 170). Most of the work orders that Appellants obtained were while they were in TWEAN's office space or while traveling to perform installations at other locations. (A000934, No. 206). Appellants never obtained work orders by going door to door to solicit new customers and were not required to make door to door sales. (A000928 & A000934, Nos. 171, 207).

## III.    Appellants' Salary Was Minimal and They Were Denied Overtime

Appellants' base salary was $300.00 per week or $7.50 per hour for a 40 hour work week. (A000912, No. 96). Appellants were not paid overtime. (A000934, No. 204). Service technicians employed by TWEAN

12

were paid overtime and were hourly employees. (A000932-A000933, No.195). If a TSR performed the installation, TWEAN waived the ordinary installation fee it would charge if a service technician performed the installation. (A000931-A000932, No. 189). As such, it is reasonable to infer that TWEAN saved money by lessening its payroll obligations by having TSRs perform installations instead of service technicians.

## SUMMARY OF THE ARGUMENT

**I.    The District Court Erred in Applying the Summary Judgment Standard to the Material Facts Set Forth by the Parties**

Appellants set forth numerous undisputed material facts and disputed material facts that were relevant to the primary duty analysis and the outside sales employee analysis that were not considered by the District Court. Instead, the District Court considered only undisputed material facts that tended to support TWEAN's arguments and a finding that Appellants were exempt from overtime wages. If all undisputed material facts were considered, with all ambiguities resolved in favor of Appellants, a reasonable jury could conclude that Appellants were misclassified as exempt employees.

13

## II. The District Court Erred in Holding that There Was No Genuine Issue of Material Fact Concerning Whether Appellants Were Exempt From Overtime as a Matter of Law

A genuine issue of material fact exists as to whether Appellants' primary duty was to install and/or repair TWEAN's products or obtain sales. Appellants' most important duty was to install and/or repair TWEAN's products, as an employee could not hold the position of TSR unless the employee could properly and safely perform installations. Further, Appellants spent the vast majority of their time performing non-sales related duties, including traveling, installing, and troubleshooting. In addition, Appellants were subject to daily supervision and control by their supervisors. Appellants were paid a salary of $300.00 per week, which equates to $7.50 per hour based upon a forty hour work week; however, Appellants were working well in excess of forty hours per week. Moreover, Appellants were trained by service technicians and like service technicians; however, service technicians were eligible for overtime and were paid as hourly employees. Appellants' solicitation efforts were minimal, as most of the sales made were indirect. Therefore, in its totality, the character of the TSR position more closely resembled that of a laborer, than a sales person. For these reasons, a genuine issue of material fact exists as to whether

Appellants' primary duty was to install and/or repair TWEAN's products or to obtain sales.

Alternatively, Appellants did not obtain work orders by going door to door to solicit new customers and were not required to make door to door sales. In fact, it was the DSRs' job to actively solicit orders at customers' residences, not the TSRs' job. Rather, most of the work orders that Appellants obtained were while they were in TWEAN's office space or while traveling to perform installations at other locations. Since Appellants were not obtaining work orders at the customer's residence and often obtained work orders from TWEAN's offices, a genuine issue of material fact exists as to whether Appellants customarily and regularly made sales away from TWEAN's place of business.

## **ARGUMENT**

### I. The District Court Erred in Its Application of the Summary Judgment Standard

#### A. Standard of Review

When "[r]eviewing a grant of summary judgment, we apply this same standard and determine de novo whether or not a genuine issue of material fact exists that would preclude judgment as a matter of law." *Gallo v. Prudential Residential Servs., LP*, 22 F.3d 1219, 1224 (2d Cir. 1994).

15

"A court should grant a motion for summary judgment only if 'there is no genuine issue as to any material fact and when, based upon facts not in dispute, the moving party is entitled to judgment as a matter of law.'" *N.Y. Electric & Gas Corp. v. Sys. Council U-7 of Electrical Workers IBEW*, 328 F. Supp. 2d 313, 315 (N.D.N.Y. 2004) (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991)). Facts are material if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "In making this determination, the court must resolve all ambiguities and draw all reasonable inferences in a light most favorable to the non-moving party." *N.Y. Electric & Gas Corp.*, 328 F. Supp. 2d at 315. In the instant action, Appellants are the non-moving party. "Initially, the burden is on the moving party to demonstrate the absence of a genuine issue of material fact." *Lewis v. Mollette*, 752 F. Supp. 2d 233, 239 (N.D.N.Y. 2010). If the moving party has carried its burden, "the non-moving party must assert specific facts demonstrating there is a genuine issue to be decided at trial." *Id.*

16

**B.  The District Court Failed to Consider Undisputed Material Facts Concerning the Applicable Exemption**

In the District Court's Memorandum-Decision and Order, the District Court relied upon pertinent facts not in dispute that tended to support TWEAN's arguments concerning Appellants' primary duty and the outside sales employee exemption.  (*See* SA000002-SA000003, SA000008-SA000011 (relying upon Statement of Material ("SMF") Nos. 1, 18, 19, 23, 26, 28-29, 31-32, 34-35, 40-41, 43-45, 48, 50-51, 58, 59, 62-63, 65, 68-69, 72, 75, 78-79, 82-84, 88-89, 91, 94, 96, 179, and 201, appearing at A000889-A000936)).  Appellants set forth numerous material facts relevant to the determination of their primary duty and the outside sales employee exemption as a whole that were undisputed by TWEAN, yet these material facts were not considered by the District Court.  (A000928-A000936, Nos. 170, 172-175, 177, 180, 185-188, 195-199, 203-204, 210, 212-215).  As a result, the District Court failed to apply the appropriate standard when considering a motion for summary judgment.  These material facts have been explained and addressed in Appellants' Statement of Material Facts above, and their relevance to the primary duty and exemption analysis is argued below.

**C.    The District Court Failed to Resolve All Ambiguities in a Light Most Favorable to Appellants**

Appellants set forth numerous material facts relevant to the determination of their primary duty and the outside sales employee exemption as a whole that were disputed by TWEAN, yet these material facts were not considered by the District Court.  (A000928-A000936, Nos. 169, 171, 176, 178, 181-184, 190-194, 200, 202, 205-209, 211, 216-217).  As a result, the District Court failed to apply the appropriate standard when considering a motion for summary judgment.   These material facts have been explained and addressed in Appellants' Statement of Material Facts above, and their relevance to the primary duty and exemption analysis is argued below.

**II.    The District Court Erred by Holding that No Genuine Issue of Material Fact Exists as to Whether Appellants Were Exempt from Overtime as Outside Sales Employees**

**A.    Standard of Review**

When "[r]eviewing a grant of summary judgment, we apply this same standard and determine de novo whether or not a genuine issue of material fact exists that would preclude judgment as a matter of law." *Gallo*, 22 F.3d at 1224.

**B.     The Outside Sales Employee Exemption**

"Subject to certain exceptions, the FLSA mandates overtime pay for employees who work more than 40 hours per week." *Mullins v. City of New York*, 653 F.3d 104, 106 (2d Cir. 2011). "The employer who invokes the exemption bears the burden of establishing that the employee falls within the exemption." *Id.* at 113. "The term 'employee employed in the capacity of outside salesman'...shall mean any employee: (1) Whose primary duty is: (i) making sales within the meaning of section 3(k) of the Act, or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500(a).

**C.     A Genuine Issue of Material Fact Exists as to the Primary Duty of Appellants' TSR Position**

"To qualify for exemption under this part, an employee's 'primary duty' must be the performance of exempt work. The term 'primary duty' means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on

all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a).

"Factors to consider when determining the primary duty of an employee include, but are not limited to, [a] the relative importance of the exempt duties as compared with other types of duties; [b] the amount of time spent performing exempt work; [c] the employee's relative freedom from direct supervision; and [d] the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." 29 C.F.R. § 541.700(a). "The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee." 29 C.F.R. § 541.700(b). The Labor Law is defined and applied in the same manner as the FLSA as it relates to exemptions. 12 N.Y.C.R.R. § 142-2.2.

In the instant civil action, Appellants' primary duty as a TSR was to perform the installation of TWEAN's products, which is discussed further below.

20

### 1. Appellants' Installation and Troubleshooting Duties Were More Important to TWEAN than Appellants' Sales Duties

If an employee of TWEAN could not learn how to safely and properly install TWEAN products, that employee could not be a TSR. (A000935, No. 215). Appellants received a week of safety, equipment, and installation training as part of becoming a TSR. (A000928, No. 172). Appellants were trained like service technicians, were trained by a service technician, and replaced the duties normally provided by service technicians to TWEAN customers. (A000928 & A000931, Nos. 172, 189). TWEAN did not have an enforceable service agreement with the customer until the installation occurred. (A000934, No. 208). Also, Appellants would not receive units credited toward their monthly quota until the installation was completed. (A000930, No. 183). If another TSR or technician performed the installation in Appellants' territory, Appellants would not receive units credited toward their monthly quota. (A000930, No. 183).

Secondary to installation was maintaining a positive relationship with the leasing agents and property managers of the apartment complexes that Appellants were assigned. (A000929, No. 175-177). One significant way that Appellants maintained a positive relationship with property managers

21

was by troubleshooting the tenants' issues with their TWEAN services. (A000929, No. 179). Appellants did not receive any extra compensation for troubleshooting or repair work. (A000929, No. 179). DSRs were door-to-door salesmen for TWEAN who solicited in the same apartment complexes that were assigned to Appellants. (A000933, No. 201). As such, it is reasonable to infer that making sales was not Appellants' most important duty because TWEAN had other employees responsible for making sales in the same apartment complexes assigned to Appellants.

> ### 2. Appellants Spent Most of Their Time Preparing to Install, Traveling to Installation Locations, Installing, and Troubleshooting

Appellants' typical day consisted mostly of physical labor related to the installation and troubleshooting of TWEAN products. (A000930-A000931, Nos. 184, 187). The actual installation of TWEAN products itself usually took between 30 minutes and an hour to complete, but, many times, it took much longer if technical difficulties emerged. (A000931, Nos. 185-186). Appellants typically performed between 5 and 10 installations per day. (A000934, No. 209). In addition, Appellants were the point of contact for all customers, leasing agents, and property managers of the apartment complexes they were assigned, who would contact Appellants if there were technical difficulties or mechanical issues to be addressed. (A000929-

22

A000930, Nos. 179-180). Moreover, Appellants were assigned to various apartment complexes throughout Onondaga County that required a significant amount of travel time to reach. (A000933 & A000935, Nos. 198, 213-14). In contrast, Appellants' time taking work orders from customers and dropping off promotional information with leasing agents and property managers was minimal. (A000897 & A000934-A000935, Nos. 31-34, 209-210). Appellants did not directly contact potential customers of TWEAN to obtain work orders; instead, potential customers of TWEAN would contact Appellants by telephone to place a work order. (A000928, No. 169-170). It took only about 5 to 10 minutes for Appellants to obtain the information needed for each work order. (A000935, No. 210). As such, an analysis of this factor favors a finding that most of Appellants' time working was spent on non-exempt work.

### 3. Appellants Were Subject to Daily Supervision and Control by TWEAN's Supervisors and Managers

As TSRs, Appellants were assigned to various supervisors or managers at different times. (A000933, No. 199). Appellants were required by their supervisors and managers to work Monday through Saturday. (A000932, No. 193). Appellants' supervisors and managers required Appellants to go to TWEAN's offices each work day, except some

23

Saturdays, and were required to attend weekly meetings with their supervisors. (A000932, No. 194). Appellants were required to report daily to their supervisors, and keep their supervisors apprised of their location and the work Appellants were performing. (A000929, No. 191). If Appellants missed a scheduled installation, their supervisors would contact them and seek an explanation as to why the installation was not performed. (A000929, No. 192).

### 4. Appellants Received a Low Salary and Displaced Service Technicians Who Were Paid an Hourly Wage and Were Eligible for Overtime Pay

Appellants' base salary was $300.00 per week or $7.50 per hour for a 40 hour work week. (A000912, No. 96). Appellants were not paid overtime. (A000934, No. 204). Service technicians employed by TWEAN were paid overtime and were hourly employees. (A000932, No. 195). Appellants were trained like service technicians, were trained by a service technician, and replaced the duties normally provided by service technicians to TWEAN customers. (A000928 & A000931, Nos. 172, 189). In effect, Appellants lessened TWEAN's need for service technicians and it is reasonable to infer that TWEAN saved money by lessening its payroll obligations by having TSRs perform installations instead of service technicians. This inference is supported by the fact that if a TSR performed

24

the installation, the ordinary installation fee was waived. (A000931, No. 189). As such, this factor favors a finding that Appellants' primary duty was the performance of installations and other technical services.

### 5. Appellants' Solicitation Efforts Were Minimal

Appellants were involved in minimal 'solicitation' efforts. The extent of Appellants 'solicitation' efforts were to make initial contact with the leasing agent or property manager of the apartment complex and provide the leasing agent or property manager with promotional information from TWEAN. (A000897, Nos. 31-34). After that, it was up to the leasing agent or property manager to cooperate and the potential customer to contact Appellants to place a work order. (A000898, A000928-A000929, & A000934, Nos. 36, 169-171, 177, 206-07).

### 6. The Character of Appellants' Job as a Whole Was that of Laborers, Not Salesmen

Appellants typical day consisted mostly of physical labor related to the installation and troubleshooting of TWEAN products. (A000930-A000931, No. 184). To the extent that Appellants took work orders from customers and dropped off promotional information with leasing agents and property managers, it was but a minor portion of their duties and work actually performed. (A000897 & A000934-A000935, Nos. 31-34, 209-10).

Appellants were trained like service technicians, were trained by a service technician, and replaced the duties normally provided by service technicians to TWEAN customers. (A000928 & A000931, Nos. 172, 189). If Appellants missed a scheduled installation, TWEAN would not send a service technician in their place; instead, Appellants' supervisors would inquire with Appellants about when Appellants would be performing the installation. (A000932, No. 192). Lastly, and perhaps most importantly, if Appellants proved incapable of safely and effectively installing TWEAN products, they could not work as a TSR. (A000935, No. 215). Thus, the character of Appellants' job as a TSR, as a whole, was to perform physical labor related to the installation of TWEAN products, not the sale of TWEAN products.

### D. Alternatively, a Genuine Issue of Material Fact Exists as to Whether Appellants Customarily and Regularly Made Sales away from TWEAN's Place of Business

"An outside sales employee must be customarily and regularly engaged 'away from the employer's place or places of business.' The outside sales employee is an employee who makes sales at the customer's place of business or, if selling door-to-door, at the customer's home. Outside sales does not include sales made by mail, telephone or the Internet unless such contact is used merely as an adjunct to personal calls. Thus, any fixed

26

site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales is considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property." 29 C.F.R. § 541.502.

In the instant civil action, Appellants obtained work orders by telephone either while at TWEAN's offices or while traveling to perform unrelated installations, not at the customer's residence. (A000928 & A000934, Nos. 169-171, 206-207). Appellants did not directly solicit potential customers for TWEAN. (A000928, No. 169). Instead, potential customers of TWEAN would call Appellants to place a work order. (A000928, No. 170). Appellants did not obtain work orders by going door to door to solicit new customers and were not required to make door to door sales. (A000928 & A000934, Nos. 171, 207). In fact, it was the DSRs' job to actively solicit orders at customers' residences, not the TSRs' job. (A000933, No. 201). Rather, most of the work orders that Appellants obtained were while they were in TWEAN's office space or while traveling to perform installations at other locations. (A000930-A000931 & A000934, Nos. 184, 206). Since Appellants were not obtaining work orders at the customer's residence and often obtained work orders from TWEAN's

27

offices, a genuine issue of material fact exists as to whether Appellants customarily and regularly made sales away from TWEAN's place of business. *See* 29 C.F.R. § 541.502. Therefore, the Court should deny TWEAN's motion for summary judgment.

## **CONCLUSION**

For the reasons stated herein, Appellants respectfully request that this Court reverse the District Court's award of summary judgment to TWEAN in regard to Appellants' unpaid overtime claims pursuant to the FLSA and NYLL, and remand this action for further proceedings.

Dated: August 7, 2017          Respectfully submitted,
New York, New York

LEVINE & BLIT, PLLC

_____

MATTHEW J. BLIT
*Attorneys for Plaintiffs-Appellants*
Empire State Building
350 Fifth Avenue, 40th Floor
New York, NY 10118
Phone: (212) 967-3000
Fax: (212) 967-3010
mblit@levineblit.com

28

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

I hereby certify pursuant to Fed. R. App. P. 32(a)(7)(C) that the attached brief is proportionally spaced, has a typeface (Times New Roman) of 14 points, and contains 5,209 words (excluding as permitted by Fed. R. App. P. 32(a)(7)(B), the corporate disclosure statement, table of authorities, and certificate of compliance), as counted by the Microsoft Word processing system used to produce this brief.

Dated: August 7, 2017

_____

MATTHEW J. BLIT

## CERTIFICATE OF SERVICE

I, Matthew J. Blit, do certify that, on August 7, 2017, I caused a true and correct copy of Appellants' Brief in Support to be served by and through the ECF system, on the following:


Kabat, Chapman & Ozmer, LLP
J. Scott Carr, Esq.
171 17th Street NW, Suite 1550
Atlanta, GA 30363

Mackenzie, Hughes Law Firm
William B. Hunt, Esq.
101 South Salina Street
Syracuse, NY 13221


Dated: August 7, 2017

MATTHEW J. BLIT

31

# No. 17-1219

_____

UNITED STATES COURT OF APPEAL
SECOND CIRCUIT

_____

JEFFREY SYDNEY, on behalf of themselves and others similarly situated, STEPHEN CAPOUSIS, on behalf of themselves and others similarly situated,

*Plaintiffs - Appellants*,

-v-

TIME WARNER ENTERTAINMENT - ADVANCE/NEWHOUSE PARTNERSHIP,

*Defendant - Appellee*,

TIME WARNER CABLE, INC.,

*Defendant.*

_____

*On Appeal from an Order of the United States District Court for the Northern District of New York*

_____

**SPECIAL APPENDIX**

_____

Matthew J. Blit
LEVINE & BLIT, PLLC
350 5th Avenue, Suite 4020
New York, NY 10118
(212) 967-3000
*Attorney for Appellants'*

August 7, 2017

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**JEFFREY SYDNEY and STEPHEN CAPOUSIS,** *on behalf of themselves and others similarly situated,*

$\qquad$ **Plaintiffs,**

$\qquad$ v.

**TIME WARNER ENTERTAINMENT-ADVANCE/NEWHOUSE PARTNERSHIP,**

$\qquad$ **Defendant.**

$\qquad$ 5:13-CV-286
$\qquad$ (FJS/TWD)

---

**APPEARANCES**

**LEVINE & BLIT, PLLC**
499 South Warren Street, Suite 500B
Syracuse, New York 13202
-and -
350 Fifth Avenue
Suite 3601
New York, New York 10118
Attorneys for Plaintiffs

**KABAT, CHAPMAN & OZMER LLP**
171 17th Street, NW, Suite 1550
Atlanta, Georgia 30363
Attorneys for Defendant

**WARGO & FRENCH LLP**
999 Peachtree Street, NE
26th Floor
Atlanta, Georgia 30309
Attorneys for Defendant

**OF COUNSEL**

**LEWIS G. SPICER, ESQ.**
**JUSTIN S. CLARK, ESQ.**
**MATHEW J. BLIT, ESQ.**

**J. SCOTT CARR, ESQ.**

**PRIYA B. VIVIAN, ESQ.**
**RACHEL E. SANKEY, ESQ.**

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Pending before the Court is Defendant's motion for summary judgement pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See generally* Dkt. No. 68. Plaintiffs oppose this motion. *See* Dkt. Nos. 71-75.

### II. BACKGROUND

Defendant provides telecommunications services, including cable television, internet, and phone services to the public. *See* Dkt. No. 68-2 at ¶ 1. In December 2010, Defendant hired Plaintiff Jeffrey Sydney and Plaintiff Steven Capousis to serve as Territory Sales Representatives ("TSR"). *See id.* at ¶¶ 18, 19. TSRs were responsible for identifying multiple dwelling unit buildings and forming relationships with the owners and managers of the complexes. *See id.* at ¶¶ 23, 26. TSRs would introduce themselves to staff at the property to discuss services that were available to the tenants. *See id.* at ¶ 28. Based on this relationship, TSRs would request that the staff tell new tenants to call the TSR to purchase Defendant's services. *See id.* at ¶ 29. TSRs had to keep in constant communication with staff at the property and would meet with them either every week or every other week. *See id.* at ¶¶ 31, 32. TSRs would hand out business cards and brochures that contained their contact information and information about Defendant's services. *See id.* at ¶¶ 34, 35. Property staff would often include brochures in a new tenant's welcome package or leave brochures in the building's common areas. *See id.* at ¶¶ 40, 41.

An additional way TSRs promoted themselves was to hold events at various properties. *See id.* at ¶ 43. TSRs would create flyers and work with property staff to promote the event. *See*

- 2 -

*id.* at ¶ 44. These events were held to make tenants aware of Defendant's services as well as the expedited service that the TSRs could provide. *See id.* at ¶ 45.

After obtaining the TSR's contact information -- either via property staff or through property events -- tenants would call the TSR directly to set up service. *See id.* at ¶ 48. TSRs would try to get customers to sign up for as many services as possible and could process the order over the phone. *See id.* at ¶¶ 50, 51. TSRs could then provide self-installation kits, schedule a technician to complete the installation, or schedule a time when the TSR could install the customer's services themselves. *See id.* at ¶¶ 53, 54, 55, 57, 59.

Plaintiffs allege that they worked between 50-70 hours per week. *See id.* at ¶¶ 61, 64. The majority of Plaintiffs' time was spent in the field, although they often spent the mornings in the office. *See id.* at ¶¶ 62, 63, 65, 68, 69.

TSRs received formal and informal sales training. *See id.* at ¶ 72. TSRs also attended weekly sales meetings to discuss sales tips. *See id.* at ¶ 75. TSRs were expected to reach minimum performance requirements that included maintaining "49 Primary Service Unit ("PSU")[1] sales in a fiscal month." *See id.* at ¶¶ 78, 79. Plaintiffs both achieved satisfactory performance reviews; however, they were each encouraged to knock on more doors within the complex to improve their overall sales volume. *See id.* at ¶¶ at 82, 83. Plaintiffs also received weekly rankings based on their sales against other Direct Sales Representatives ("DSR") and TSRs in the area. *See id.* at ¶ 84. DSRs worked in the same regions and were expected to sell Defendant's services door-to-door. *See* Dkt. No. 71 at ¶ 201.

TSRs were paid an annual salary of $15,600 on a bi-weekly basis. *See id.* at ¶ 96. TSRs were additionally paid commission based on the Territory Sales Representative Commission

---

[1] The primary PSUs include the following: cable, phone, and internet. *See* Dkt. No. 68-2 at ¶ 13.

Plan ("Commission Plan"). *See id.* at ¶ 88. The plan's purpose was to incentivize TSRs to

achieve sales objectives. *See id.* at ¶ at 89. TSRs received commission based on the "(1) number

of PSUs sold; (2) monthly recurring revenue ("MRR") generated by those PSUs; and (3) the

number of bundle sales." *See id.* at ¶ 91.

Occasionally, TSRs disputed the commission amounts that were paid. *See id.* at ¶ 112.

Defendant implemented a dispute process system to consider the potential discrepancies. *See id.*

at ¶ 113. Both Plaintiffs utilized the dispute process. *See id.* at ¶¶ 124, 127.

Defendant terminated Plaintiff Sydney's employment on August 29, 2012. *See id.* at

¶ 145. Plaintiff Sydney admitted to Human Resources that he had violated Defendant's cash

handling policy on August 24, 2012, because he failed to turn in customer payments within the

prescribed timeframe. *See id.* at ¶¶ 136, 143. Defendant terminated Plaintiff Capousis's

employment on April 9, 2013. *See id.* ¶ at 158. In late February 2013, Defendant "received a

complaint that Plaintiff Capousis had written down a customer's social security number and

given it to another customer." *See id.* at ¶ 150. The Human Resources Department and a Sales

Manager investigated the matter and held a meeting with Plaintiff Capousis at which he denied

the accusation but admitted that he routinely wrote down customers' social security numbers.

*See id.* at ¶¶ 151-53. At that meeting, Plaintiff Capousis produced his work notebook that had

several other customers' personal information inside that was weeks old. *See id.* at ¶¶ 154-56.

Based on these allegations, Plaintiffs bring a collective action to remedy unpaid overtime

compensation in violation of the Fair Labor Standards Act of 1938, as amended. ("FLSA"). *See*

Dkt. No. 47 at ¶ 1. Plaintiffs also bring a class action for violations of the New York Labor Law

("NYLL") "as a result of unpaid overtime, unpaid commissions, and breach of contract stemming

from [Defendant's] non-payment of commissions." *See id.* Finally, Plaintiffs bring individual

claims against Defendant for retaliating against them due to their opposition to unfair labor practices. *See id.*

## III. DISCUSSION

### A.    Standard of review

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying which materials "demonstrate the absence of genuine issues of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law" and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If the movant meets this burden, the nonmoving party must ""'set forth specific facts showing a genuine issue for trial.'"" *Id.* (quotation omitted).  "[I]n ruling on a motion for summary judgment, the district court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments[.]" *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996) (citations omitted).  However, the nonmoving party cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing [*Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (*per curiam*)]).

**B.     Overtime claims under the FLSA and NYLL**

Subject to certain exemptions, the FLSA and the NYLL require employers to pay

overtime to employees who work more than 40 hours in a workweek. *See* 29 U.S.C. § 207(a)(1);

12 N.Y. C.R.R. § 142-2.2 (stating that "[a]n employer shall pay an employee for overtime . . . in

the manner and methods provided in and subject to the exemptions of sections 7 and 13 of 29

U.S.C. 201 *et seq.*, the Fair Labor Standards Act of 1938, as amended, . . ."). There are two

exemptions relevant to the current litigation. First, the FLSA exempts "any employee employed

. . . in the capacity of outside salesman[.]" 29 U.S.C. § 213(a)(1). Second, an employee of a

retail or service establishment is similarly exempt. *See* 29 U.S.C. § 207(i).

"The exemption question" under the FLSA "is a mixed question of law and fact." *Myers*

*v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010) (citation omitted). "The question of how the

[employees] spent their working time . . . is a question of fact. The question whether their

particular activities excluded them from the overtime benefits of the FLSA is a question of law. .

. ." *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).

As the Second Circuit stated in *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611 (2d Cir.

1991), however, "because the FLSA is a remedial act, its exemptions, such as the '[outside sales

or retail]' exemption claimed in this case, are to be narrowly construed." *Id.* at 614 (citations

omitted). "To extend an exemption to other than those plainly and unmistakably within its terms

and spirit is to abuse the interpretative process and to frustrate the announced will of the people."

*A.H. Phillips, Inc., v. Walling*, 324 U.S. 490, 493 (1945). Accordingly, "an employer bears the

burden of proving that its employees fall within an exempted category of the Act." *Martin*, 949

F.2d at 614 (citations omitted).

- 6 -

As noted, the FLSA overtime requirements do not apply to an outside salesperson, defined as an employee

> (1) Whose primary duty is: (i) making sales within the meaning of section 3(k) of the Act, or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

> (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a)(1)-(2).

According to the regulations, "[t]he term 'primary duty' means the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). The FLSA defines the word "sale" to "include[] any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k).[2] The parties' main dispute in this case is whether Plaintiffs' primary duty was making sales or installing services.

Courts have articulated numerous factors relevant to an employee's status as an outside salesperson, "including (1) whether the employee generates commissions for himself through his work, (2) the level of supervision of the employee, (3) the amount of work done away from the employer's place of business, (4) whether the employee independently solicits new business, and (5) the extent to which the employee's work is unsuitable to an hourly wage." *Chenensky v. N.Y. Life Ins. Co.*, No. 07 CIV. 11504, 2009 WL 4975237, *5 (S.D.N.Y. Dec. 22, 2009) (citations omitted). Courts also consider the relative importance of an employee's exempt duties relative to his other duties, *see* 29 C.F.R. § 541.700(a), as well as "whether the employee's compensation is based wholly or significantly on commission[,]" *Schmidt v. Eagle Waste & Recycling, Inc.*, 598

---

[2] The Supreme Court interpreted "other disposition" to "include[e] those arrangements that are tantamount, in a particular industry, to a paradigmatic sale of a commodity." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, __, 132 S. Ct. 2156, 2171–72 (2012).

F. Supp. 2d 928, 935 (W.D. Wis. 2009), *aff'd*, 599 F.3d 626 (7th Cir. 2010) (citations omitted); *see also Ackerman v. Coca-Cola Enters., Inc.*, 179 F.3d 1260, 1266 (10th Cir. 1999) (noting that courts recognize an important "distinction between employees who consummate sales at out-of-the-office locations and those employees who do not consummate sales there").

Plaintiffs' job title was Territory "Sales" Representative and was within Defendant's Direct "Sales" Department. *See* Dkt. No 68-2 ¶¶ 9-10. Although Plaintiffs received a bi-weekly salary of $600.00, the majority of their salary came from commissions. *See* Dkt. No. 68-1 at 7. Plaintiffs received commissions for all completed sales. *See* Dkt. No 68-2 ¶¶ 91, 94. Commissions were based on the (1) number of PSUs sold; (2) monthly recurring revenue generated by those PSUs; (3) the number of bundle sales; and (4) performing installations. *See id.* at ¶ 91; *see also* Dkt. No 68-4 Hirsch Aff. at ¶ 6; Dkt. No 80-2 "Exhibit A" (showing breakdown of how commissions are paid). Plaintiffs did not have to perform the installation to receive commission for the sale. *See* Dkt. No. 68-6 at TWC000306-12.[3]

Plaintiffs' duties involved seeking out and building relationships with property managers and leasing agents at apartment complexes throughout Onondaga County. *See* Dkt. No. 68-2 at ¶ 26. Plaintiffs formed and initiated these relationships to describe Defendant's products so that, in turn, new tenants would contact Plaintiffs directly to sign up for service. *See id.* at ¶¶ 28-29. Plaintiffs attempted to meet with the property managers at least once a week or every other week. *See id.* at ¶ 32. Plaintiffs also promoted themselves at events in the complexes where they

---

[3] Plaintiffs make the conclusory statement that they were not paid for services they did not install. However, Plaintiffs do not refer to any facts that support this claim, and their contention is directly contradicted by affidavits and exhibits showing that Plaintiffs received Monthly Recurring Revenue credit for services they procured but either had a technician install or sent the customer a self-install kit. *See* Dkt. No. 68-2 at ¶ 91; *see also* Dkt. No 68-4 Hirsch Aff. at ¶ 6; Dkt. No 80-2 "Exhibit A" (showing breakdown of how commissions are paid).

could directly sign people up for service. *See id.* at ¶ 43. Thus, Plaintiffs received orders

through referrals or through these events. *See id.* at ¶ 47. Importantly, "[w]ithout a positive

relationship with the leasing agents or property managers, Plaintiffs were less likely to obtain

work orders from their assigned complexes." *See* Dkt. No. 72 at 5.

To help reach their goals, Plaintiffs attended sales trainings, tracked their statistics against

other TSRs, and had yearly performance reviews that included tips to increase their sales

numbers. *See* Dkt. No. 68-2 at ¶¶ 78-87. The majority of Plaintiffs' time was spent out of the

office meeting with apartment staff, taking work orders, and installing services. *See id.* at ¶¶ 62-

63, 65-71. Plaintiffs claim to have worked anywhere between 50-70 hours a week. *See id.* at

¶¶ 61, 64

Plaintiffs also installed services and addressed minor technical issues for existing

customers. *See* Dkt. No. 72 at 3. Plaintiffs contend that "one significant way that [they]

maintained a positive relationship with property managers was by troubleshooting tenants' issues

with [Defendant's] services." *See id.* at 5. Furthermore, customers placed orders directly with

TSRs because it was more convenient, e.g., TSRs could offer same-day installation. *See* Dkt.

No. 68-2 at ¶¶ 58-59.

Based on these undisputed facts, the Court finds that Plaintiffs' primary duty was making

sales. Although Plaintiffs contend that they never went door-to-door to make sales, the entirety

of their job was focused on acquiring new customers. Plaintiffs admit that performing

installations and troubleshooting helped them maintain better relationships with the property

managers and customers, thereby helping them obtain additional work orders and consequently

more commissions. *See Schmidt*, 598 F. Supp. 2d at 936 (noting that engaging in activities

related to resolving issues and retaining customers directly affected the commissions received).

For example, TSRs could work to build relationships with property managers while never installing any services (because they provided self-install kits or scheduled a technician), but still obtain monthly recurring revenue commissions; however, if TSRs only performed installations, and never worked with property managers to obtain referrals, they would have no work orders and thus no commissions. *See, e.g., Chenensky*, 2009 WL 4975237, at *6 (noting that "[Plaintiff] would not have received *any* wages from [Defendant] had he only advised clients or maintained good relationships with customers").

Moreover, as the court in *Nielsen v. DeVry, Inc.*, 302 F. Supp. 2d 747 (W.D. Mich. 2003), explained, "the consummation of sales requires a measure of the capacity of two parties." *Id.* at 760. In other words, the buyers (tenants in this case) "must have the capacity to purchase or place an order for a product or service"; and the seller (Plaintiffs in this case) "must have the capacity to consummate sales, take orders, or obtain commitments from the buyer for the purchase of the employer's services." *Id.* Given the above-stated facts, Plaintiffs clearly "consummated sales [and] directed their efforts toward the consummation of sales[.]" *Id.*

Altogether, the TSR's job constituted a revolving cycle of initiating the sale, obtaining a work order, scheduling the installation, and oftentimes performing the installation -- all in pursuit of obtaining as many customers and commissions as possible. *See Schmidt*, 598 F. Supp. 2d at 936 (noting that the "plaintiff engaged in a number of activities only indirectly related to sales, but benefitting her sales activities . . . [such as] develop[ing] plans and materials to attract new customers[,] . . . attend[ing] local Chambers of Commerce meetings and social functions to promote sales . . . [and] engag[ing] in activities related to resolving account and service disputes in order to retain her customers. . . . All of these activities directly affected the commission payments she received.")

Thus, this case is distinguishable from those situations in which the courts have concluded that the outside salesperson exemption did not apply. *See, e.g., Campanelli v. Hershey Co.*, 765 F. Supp. 2d 1185, 1190 (N.D. Cal. 2011) (finding that the outside salesperson exemption did not apply where the plaintiff-employees almost never made direct sales but rather promoted a product while other representatives of the employer actually took the orders and made the sales); *Hodgson v. Klages Coal & Ice Co.*, 435 F.2d 377, 282 (6th Cir. 1970) (finding the outside salesperson exemption inapplicable when the plaintiffs only delivered a product but did not make the initial sale). Unlike these cases, Plaintiffs fostered their relationship with apartment staff and took direct orders from customers. In essence, each installation marked the final consummation of a sale. Therefore, considering the TSR job as a whole, the Court finds that Plaintiffs' primary duty was to obtain sales.

Furthermore, the undisputed facts establish that Plaintiffs were "customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500(a)(2). In fact, Plaintiffs admit that they spent the majority of their time outside of the office, thereby satisfying this element of the outside salesperson test. *See* Dkt. No. 68-2 at ¶¶ 62-63, 65-71.

Accordingly, for the above-stated reasons, the Court concludes that Plaintiffs have not raised an issue of material fact with regard to their duties and that, as a matter of law, the outside salesperson exemption applies to Plaintiffs. Therefore, the Court grants Defendant's motion for summary judgment as to Plaintiffs' FLSA and NYLL overtime claims.[4]

---

[4] Since the Court has determined that the outside salesperson exemption applies to Plaintiffs, it does not need to address Defendant's alternative argument that the retail or service establishment exemption also applies to this case.

- 11 -

**C.    Unpaid sales commissions claims**

*1. Labor Law § 191-b*

New York Labor Law § 191–b allows an aggrieved party to bring an action against

another party that has "breached its duty to pay commissions earned under the parties' oral and

written agreements." *AHA Sales, Inc. v. Creative Bath Prods., Inc.*, 58 A.D.3d 6, 17 (2d Dep't

2008) (footnote omitted).  "New York Labor Law § 191-b protects 'sales representatives' in their

dealings with their principals, and sets out the requirements for payment of commissions."

*Derven v. PH Consulting, Inc.*, 427 F. Supp. 2d 360, 369 (S.D.N.Y. 2006).  The statute "defines

'[s]ales representatives' as *independent contractors*, in contrast to 'commission' salespersons, who

are classified as employees[.]"  *AHA Sales*, 58 A.D.3d at 15 (emphasis added) (citing N.Y. Lab.

Law § 191-a[d]).

The undisputed facts show that Plaintiffs are not independent contractors.  *See* Dkt. No.

68-2 at ¶¶ 4, 6.  Therefore, the Court finds that Plaintiffs' claims fail as a matter of law and

thereby grants Defendant's motion for summary judgment as to Plaintiffs' § 191-b claim.  *See*

*Derven*, 427 F. Supp. 2d at 370.

*2. Labor Law § 191(1)(c)*

New York Labor Law § 191(1)(c) provides, in relevant part, that "[a] commission

salesperson shall be paid the wages . . ., commissions and all other monies earned or payable in

accordance with the agreed terms of employment[.]"  N.Y. Lab. Law § 191(1)(c).  "It is beyond

dispute that the phrase 'in accordance with the agreed terms of employment' means that the

parties to an employment agreement may define for themselves the circumstances under which

wages [or commissions] are 'earned.'"  *Giugliano v. FS2 Capital Partners, LLC*, No. 14-cv-7240,

2015 WL 5124796, *15 (E.D.N.Y. Sept. 1, 2015) (citations omitted); *see also Pachter v. Bernard Hodes Grp., Inc.*, 10 N.Y.3d 609, 618 (2008) (stating that, "in the absence of a governing written instrument, when a commission is 'earned' and becomes a 'wage' for purposes of Labor Law article 6 is regulated by the parties' express or implied agreement").

In this case, the TSR Commission Plan governs whether Plaintiffs have received the commissions that Defendant owed to them. The TSR Commission Plan states that "[a]ll discrepancies must be submitted no later than the 5th day of the month for the previous fiscal month. . . . Discrepancies not submitted within the defined period are not eligible for commission." *See* Dkt. No. 68-6 at 92 (TWC000308). Thus, the TSR Commission Plan has a prerequisite for obtaining any commissions that TSRs believe they were owed but did not receive, namely, filing a discrepancy within five days after the end of the month. *See id.*

To support his claim, Plaintiff Sydney states, "I believe I am still owed approximately $5,000 in commissions." *See* Dkt. No. 74, Aff. of Jeffrey Sydney, at ¶ 45. To support his claim, Plaintiff Capousis states, "Throughout 2012 and into 2013, I was not receiving my earned commissions." *See* Dkt. No. 75, Aff. of Stephen Capousis, at ¶ 41. He further states that, after making complaints, "I was told that [Defendant] was investigating the matter. An investigation was done and it was determined that I was owed over $1,000 and I still have not been paid this money." *See id.* at ¶ 42.

Plaintiffs fail to specify any particular transaction for which Defendant owed them commission. Most importantly, from a contract perspective, Plaintiffs' statements fail to mention whether they complied with the TSR Commission Plan by filing a discrepancy in the month following the month in which they believed Defendant owed them a commission. *See Giugliano*, 2015 WL 5124796, at *15. Although Defendant Capousis makes some allegations of

- 13 -

commissions owed, his vague conclusions fail to specify dates, amounts, and whether he first filed a discrepancy.  Therefore, because Plaintiffs have failed to create a genuine issue of material fact, the Court grants Defendant's motion for summary judgment with regard to Plaintiffs' § 191(1)(c) claim.

**D.     Retaliation claims**

Plaintiffs raise two unlawful retaliation causes of action, one under the FLSA, 29 U.S.C. § 215(a)(3), and the other under New York Labor Law, N.Y. Lab. Law § 215(1)(a).  *See* Dkt. No. 47 at ¶¶ 73-82.  The FLSA provides that it is unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."  29 U.S.C. § 215(a)(3).  Similarly, NYLL provides that "[n]o employer ..., shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint to his or her employer[.]"  N.Y. Lab. Law § 215(1)(a).

*1. FLSA*

To establish a prima facie case of retaliation, "a plaintiff must show '(1) participation in protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'" *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 472 (S.D.N.Y. 2008) (quotation omitted).  "The plaintiff's burden at the beginning of the case is a light one, usually demanding

- 14 -

only that the protected activity preceded the adverse action in order to satisfy the causation requirement." *Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir. 2001) (citation omitted).

The FLSA "prohibits retaliation against employees who orally complain to their employers, so long as their complaint is 'sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection.'" *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 117 (2d Cir. 2015) (quoting *Kasten [v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14], 131 S. Ct. at 1335 [(2011)]).[5] Plaintiffs assert that they made frequent complaints about pay, including unpaid commissions and overtime. *See* Dkt. No 71 at ¶¶ 200, 216, 217. Specifically, Plaintiff Sydney stated in his deposition that he "made complaints that we weren't being compensated for amount of time and work that we were putting in -- for installation." *See* Dkt. No 73-1 at 115 (page 126 of deposition). Plaintiff Sydney stated that he made those complaints to his supervisor, William Edwards. *See id.* Plaintiff Capousis stated that he made complaints "two or three times" to his supervisor Matt LeClair and William Edwards about not being paid enough money and not being paid overtime. *See id.* at 139-141. In sum, Plaintiffs only assert that they made oral complaints to several supervisors about not being paid enough.

To qualify as a protected activity, oral complaints must be "made to employers in a context that makes the assertion of rights plain." *Greathouse*, 784 F.3d at 115. The court in *Greathouse* made it clear that a complaint must include "'*some* degree of formality.'" *Id.* at 116 (quotation omitted). The complaint must be formal enough, "'where the recipient has been given

---

[5] Defendant initially argued that only a complaint to a government official constituted a "protected activity." *See* Dkt. No. 68-1 at 22-23. The case law on which Defendant relied has been overruled, thus this argument is no longer valid. *See Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 117 (2d Cir. 2015) (overruling *Lambert v. Genesee Hospital*, 10 F.3d 46 (2d Cir. 1993)).

- 15 -

fair notice that a grievance has been lodged and does, or should, reasonably understand the

matter as part of its business concerns[.]'" *Id.* (quotation omitted) (stating, "[i]t seems to us

inconsistent with *Kasten* to elevate a grumble in the hallway about an employer's payroll practice

to a complaint 'filed' with the employer within the meaning of section 215(a)(3)"). Therefore, "'a

complaint is "filed" [only] when a reasonable, objective person would have understood the

employee to have put the employer on notice that the employee is asserting statutory rights under

the Act.'" *Id.* (quoting [*Kasten*, 131 S. Ct.] at 1335).

      In this case, the alleged complaints are ill-documented and unclear. Plaintiffs' deposition

testimony only makes cursory reference to complaining about overtime. The main thrust of their

complaints appears to center on being underpaid. *See* Dkt. No. 73-1 at 115 (Q. Did you

specifically say you should be paid overtime? A. I said we should be paid more money for the

amount of work that we're doing"). In essence, Plaintiffs' complaints were that they should be

paid in the same manner as service technicians. *See* Dkt. No. 73-1 at 115 ("I believe we talked

about overtime. If we were going to be doing that, since we were being -- since we were

technically technicians, technicians are paid overtime and we should be paid the same."); 140

(Plaintiff Capousis stating he was fired for being "[n]ot happy about not getting paid and the pay

scale we were on.").

      These complaints do not provide any specificity as to the illegality of Defendant's actions

and, at best, only put Defendant on notice that Plaintiffs believed that they had not been paid

what was promised. However, complaints about unpaid commissions and about Defendant's pay

structure do not assert a colorable violation of the FLSA and are thus not protected activity.

"That is because, under settled law, the FLSA neither converts an employer's contract breach into

a violation of federal law, nor generally federalizes disputes between employers and employees."

- 16 -

*Dunn v. Sederakis*, 143 F. Supp. 3d 102, 110–11 (S.D.N.Y. 2015) (citing *Nakahata v. New York– Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 201 (2d Cir. 2013) ("The FLSA statute requires payment of minimum wages and overtime wages only . . .")) (other citations omitted). Although Plaintiffs need not complain that Defendant acted illegally, their complaints must be a "clear articulation of facts indicative of illegality[.]" *Dunn*, 143 F. Supp. 3d at 113. At best, Plaintiffs' generalized oral references to "overtime" might reasonably suggest to Defendant that they were asserting a breach of internal policy or contractual duty. *See id.* "At the very least, there would be no basis for the listener to infer that [Plaintiffs'] opaque and unexplicated reference to 'overtime' was meant to claim a violation of the FLSA." *Id.*; *see also Mohamed v. NYU*, No. 14cv8373, 2015 WL 3387218, *26 n.24 (S.D.N.Y. May 21, 2015) (stating, "[m]erely using the word 'overtime' in a complaint otherwise devoid of related facts does not state an FLSA claim").

Therefore, because Plaintiffs failed to allege facts from which a reasonable jury could find that they engaged in a protected activity, the Court grants Defendant's motion for summary judgment with respect to Plaintiffs' FLSA retaliation claims.

### 2. New York Labor Law

"In order to establish a prima facie case under New York Labor Law Section 215, the plaintiff must adequately plead that while employed by the defendant, she made a complaint about the employer's violation of the law and, as a result, was terminated or otherwise penalized, discriminated against, or subjected to an adverse employment action." *Higueros v. New York State Catholic Health Plan, Inc.*, 630 F. Supp. 2d 265, 269 (E.D.N.Y. 2009) (citations omitted). "'Once a prima facie case of retaliation is established, the burden of production shifts to the

employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action.'" *Id.* at 271 (quoting *Raniola*, 243 F.3d at 625) (other citation omitted). If the defendant has made such a showing, the plaintiff can counter the defendant's alleged legitimate, nondiscriminatory reason with evidence that the explanation is pretextual. *See id.* at 272.

Like the FLSA, a plaintiff "must show that [he] 'complained about a specific violation of the Labor Law.'" *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 472 (S.D.N.Y. 2013) (quotation omitted). "An employee need not cite a specific statute, . . . but her 'complaint to the employer [must] be of a colorable violation of the statute . . . .'" *Id.* at 473 (internal quotation and other citations omitted). As recounted above, Plaintiffs complained about how Defendant administered its commission plan. New York law requires an employer to pay employees in accordance with agreed upon contracts, such as the commission plan. *See* N.Y. Lab. Law § 191(1)(c) (providing that "[a] commission salesperson shall be paid wages . . ., commissions and all other monies earned or payable in accordance with the agreed terms of employment"). Thus, as an initial matter, the Court finds that, unlike with their FLSA claims, Plaintiffs have adequately shown that they engaged in protected activity with respect to their NYLL claims.

Furthermore, "'[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'" *Lopez v. Advantage Plumbing & Mech. Corp*, No. 15-CV-4507, 2016 WL 1268274, *3 (S.D.N.Y. Mar. 31, 2016) (quoting *Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996))). With respect to Plaintiff Sydney, he was terminated on August 29, 2012, and alleges that he last complained as late as earlier that same month. *See* Dkt. No. 74 at ¶¶ 41, 43. With respect to Plaintiff Capousis, he was terminated on April 9, 2013, and alleges that he complained in February and

March 2013. *See* Dkt. No. 75 at ¶¶ 42-44. Therefore, the Court finds that Plaintiffs have made

out a prima facie case of retaliation in violation of NYLL.

In response, Defendant has presented sufficient evidence that it had legitimate, non-

discriminatory reasons for terminating both Plaintiffs. In this regard, Defendant has presented

evidence that it terminated Plaintiff Sydney because, on August 23, 2012, a customer complained

that a $70.00 cash payment he had given to Plaintiff Sydney was not applied to his account. *See*

Dkt. No. 68-2 at ¶ 139. Furthermore, Defendant has presented evidence that it terminated

Defendant Capousis because he routinely wrote down the names, addresses, and social security

numbers of customers in a notebook, which violated company policy. *See id.* at ¶¶ 147-156.

The burden thus shifts back to Plaintiffs to support a finding that Defendant's proffered

reason is a pretext for discrimination. Plaintiff Sydney makes the conclusory and unsupported

claim that he was terminated because of his complaints and that he had previously mishandled

cash but was not punished. *See* Dkt. No. 74 at ¶ 44; Dkt No. 71 at ¶ 137. However, the record

evidence Plaintiff uses to support his claim is inconclusive, self-serving, and does not create a

genuine issue of material fact as to whether he was terminated for violating the cash handling

policy. Plaintiff Capousis' allegations of pretext are sparser. He merely alleges that it was

common practice to write down sensitive customer identification but he fails to support his

allegation with anything beyond his own testimony. Therefore, the Court finds that Plaintiffs

have failed to raise a genuine issue of material fact as to whether they were terminated in

retaliation for complaining about the TSR commission plan. Accordingly, the Court grants

Defendant's motion for summary judgment with regard to Plaintiff's NYLL retaliation claims.

## IV. CONCLUSION

Having reviewed the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for summary judgment, *see* Dkt. No. 68, is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendant and close this case.

**IT IS SO ORDERED.**

Dated: March 28, 2017
      Syracuse, New York

                                        Frederick J. Scullin, Jr.
                                        Senior United States District Judge